**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No.  21-cr-00264-RM

UNITED STATES OF AMERICA,

Plaintiff,

v.

1.   SEAN PEARCE,

Defendant.

---

**MOTION TO SUPPRESS STATEMENTS OBTAINED THROUGH UNLAWFUL CUSTODIAL INTERROGATION**

---

Mr. Pearce, through his attorney, Jolie Masterson, respectfully moves this Court for an order suppressing all statements made by Mr. Pearce in response to an unlawful custodial interrogation.  As grounds, Mr. Pearce states:

### I.   FACTS

**A.   Stop and Arrest of Mr. Pearce**

On February 1, 2021, Deputy Dodson from the Logan County Sheriff's Office stopped Mr. Pearce for failing to dim his high beams.  After determining Mr. Pearce had a warrant for his arrest for failing to appear in Pueblo County case 20T1034, Deputy Dodson arrested Mr. Pearce.[1]

The arrest process went as follows: Deputy Dodson informed Mr. Pearce he had "warrants out of Pueblo County."  He asked Mr. Pearce to step out of his vehicle, which

---

[1] All of the descriptions in this motion of Deputy Dodson's interactions with Mr. Pearce were captured on Deputy Dodson's body camera.

he did.  He told Mr. Pearce to turn around and face away from him (Deputy Dodson), and put his hands behind his back.  Mr. Pearce complied.  Deputy Dodson handcuffed Mr. Pearce's hands behind his back.

### B.     Interrogation of Mr. Pearce Without *Miranda* Warnings

Mr. Pearce inquired about the warrant and Deputy Dodson told him it looked like it was just a failure to appear warrant.  Then Deputy Dodson began speaking to Mr. Pearce, saying, "But, the other issue we have right now –."  He paused and then said into his radio, "I have one detained."  Then he continued to Mr. Pearce, "- the other issue we have right now is the meth needle in your backseat."  Mr. Pearce said it wasn't a meth needle, it was his prescription for erectile dysfunction injections.  A second deputy asked Mr. Pearce if her narcotics-trained K-9 would alert as to the presence of drugs in his vehicle and Mr. Pearce said no.  Deputy Dodson asked Mr. Pearce the name of his prescription.  Mr. Pearce gave a partial name (in the form of a number), the clinic it was from, and some other information about how he obtained the prescription (all in response to questioning by Deputy Dodson).  During this exchange, Deputy Dodson was searching the pockets of the vest Mr. Pearce was wearing.

Upon completing the search of Mr. Pearce's pockets, Deputy Dodson told Mr. Pearce he needed to have a seat in the deputy's truck and led him, handcuffed, back to his police vehicle.  Deputy Dodson helped Mr. Pearce into the backseat of the police vehicle and closed the door, leaving Mr. Pearce alone inside.  Deputy Dodson was parked behind Mr. Pearce's car and from the Deputy's truck another deputy could be seen leading her K-9 around Mr. Pearce's car.

Deputy Dodson opened his vehicle door again to speak with Mr. Pearce and asked him, other than the one needle, when they search Mr. Pearce's vehicle, would he stick himself with anything?  Mr. Pearce said no and explained the prescription he had for the needle, the clinic, and the process to obtain the prescription.  Deputy Dodson interjected questions and opinions about Mr. Pearce's statements and Mr. Pearce responded accordingly.

Deputy Dodson walked away and a third deputy began questioning Mr. Pearce, beginning with "what brings you up this way?" as Mr. Pearce remained seated in the police vehicle.  Mr. Pearce made responsive statements to him also.[2]  In front of him, the other two deputies searched his entire car.

Next, Deputy Dodson returned to Mr. Pearce, still handcuffed in his police vehicle, and asked Mr. Pearce if the vapes he found were THC or nicotine.  Mr. Pearce responded that they were THC vapes.  Deputy Dodson told Mr. Pearce (in error) that Mr. Pearce had a protection order that prohibited him from having THC.[3]  Mr. Pearce responded with confusion and Deputy Dodson's interrogation about marijuana and protection orders continued.  Mr. Pearce's response included an explanation that he didn't have a protection order, didn't get in trouble anymore, and why he was there in Logan County (to bond out a friend's girlfriend, which law enforcement clearly didn't believe and later made efforts to disprove).

---

[2] Mr. Pearce's responsive statements to this Deputy were not captured on body camera, but that Deputy later began discussing with Deputy Dodson on body camera what they believed to be conflicting statements by Mr. Pearce to each of them on this topic.

[3] It is believed that the protection ordered the deputy referred to (from Logan County in 2014) had expired and was no longer active.

### C. *Miranda* Warnings Given but No Waiver of *Miranda* Rights Obtained; Interrogation Continued

After all of those interrogations, Deputy Dodson finally informed Mr. Pearce of his *Miranda* rights, but failed to obtain a valid waiver. Specifically, Deputy Dodson said,

> You do have the right to remain silent, anything you say can and will be used against you in a court of law, you have the right to an attorney, if you cannot afford an attorney one will be provided for you before any questioning, and you can stop answering questions at any time. Do you understand all of your rights?

Mr. Pearce responded, "Yes, sir."

Deputy Dodson did not ask Mr. Pearce if he wished to *waive* the rights he just explained to him and speak without an attorney. Instead, he immediately launched into an interrogation about "all that money" that he found in Mr. Pearce's car and Mr. Pearce's explanation it had been to bond someone out of jail (which again, law enforcement clearly did not believe). Deputy Dodson continued the interrogation, asking Mr. Pearce who he was bonding out. Mr. Pearce described who had called him to ask him to bond someone out. Deputy Dodson made statements intended to elicit an incriminating response about Mr. Pearce being far from the location of his story, and Mr. Pearce continued to respond.

Deputy Dodson then got into the driver's seat of his vehicle and began to use his computer. He continued to interrogate Mr. Pearce from within the vehicle, asking if he'd been vaping and driving and asserting Mr. Pearce had a protection order. Mr. Pearce responded to all it, making incriminating statements. Another Deputy can be heard on Deputy Dodson's body camera engaging in the interrogation of Mr. Pearce regarding the protection order.

Next, Deputy Dodson drove Mr. Pearce to jail, continuing to interrogate him along the way about the THC vapes, money found in his car, the name of the person he was bonding out of jail, and expressing disbelief about Mr. Pearce's explanation. Mr. Pearce continued to make incriminating statements responsive to Deputy Dodson's interrogation.

At the jail, other deputies standing alongside Deputy Dodson searched Mr. Pearce, allegedly found pills, and interrogated Mr. Pearce about what they were and why he had them. Deputy Dodson asked Mr. Pearce whether he had a valid prescription for the Xanax. Mr. Pearce identified the pills as Xanax for which he did not have a prescription and he said he did not know why he had them

Deputies then escorted Mr. Pearce to a small room in the jail and instructed him to change into a jail uniform, which he did. Deputies left Mr. Pearce alone and continued to process his belongings. Mr. Pearce was next escorted by another deputy to a holding cell and chained by one arm to the wall.

Deputy Dodson followed Mr. Pearce into the holding cell and held up a baggie of purported drugs and asked Mr. Pearce if he "care[d] to explain this," asking Mr. Pearce what he was going to do with it, if he was going to sell it, and where he buys it. Mr. Pearce responded to Deputy Dodson's interrogation, including making statements about the weight of it, it being personal use, a year's supply, it being cheaper to buy that way, etc. Deputy Dodson also interrogated Mr. Pearce again about the money, in response to which he made statements about tip money from his wife's grooming business.

Deputies counted Mr. Pearce's money and arrived at a total amount of $9,565.00, and again Deputy Dodson returned to Mr. Pearce and made statements to

5

Mr. Pearce intending to elicit an incriminating response, such as the amount of money he had and telling him (erroneously) that there was no one in the jail with the name of the person Mr. Pearce said he was bonding.

At no time did any Deputy ever ask Mr. Pearce if he agreed to waive his *Miranda* rights and speak with them.

## II.     LEGAL AUTHORITY

### A.     Custodial Interrogation and *Miranda* Requirements

The Fifth Amendment to the U.S. Constitution guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. AMEND. V.  Accordingly, the Supreme Court has held that any confession obtained during a "custodial interrogation" may not be used against the defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the Fifth Amendment right against self-incrimination.  *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

Thus, when a suspect is in custody, the police must not interrogate him until they have provided him with an advisement of his right to counsel, privilege against self-incrimination, and obtained a knowing and intelligent waiver of those rights by the suspect.  *Miranda*, 384 U.S. 436.  If the *Miranda* requirements are not complied with, the statements by the suspect must be suppressed at trial.  U.S. CONST. AMEND V; *Oregon v. Elstad*, 470 U.S. 298, 306-07 (1985); *David v. Workman*, 695 F.3d 1060, 1068 (10th Cir. 2012).

The ultimate inquiry for purposes of determining whether a suspect is in custody is whether there is a formal arrest or restraint of freedom of movement of the degree

associated with formal arrest.  *California v. Beheler*, 463 U.S. 1121, 1125 (1983).  The Tenth Circuit has said a person is in "custody" when she has been "deprived of [her] freedom of action in any significant way" that rises to the "degree associated with formal arrest."  *United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007) (internal quotations omitted).  This is an objective test, analyzing "whether a reasonable [person] in the suspect's position would have understood [her] situation as the functional equivalent of formal arrest."  *Id.* (internal quotations omitted).

Courts look to a non-exhaustive set of factors to determine whether the suspect is in custody: (1) the extent "to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will," (2) the nature of questioning, and "prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave," and (3) whether police dominate the encounter, such as separating the suspect from family, isolation, threatening presence of several officers, display of a weapon, physical contact with the suspect, and officer's use of language or tone of voice to indicate that compliance might be compelled.  *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008).

Interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of law enforcement that law enforcement should know are reasonably likely to elicit an incriminating response from the arrestee.  *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980).  This latter part of the definition focuses primarily on the perceptions of the suspect, rather than the intent of the police.  *Id.*

The prosecution bears the burden of proving, by a preponderance of the evidence, a valid *Miranda* waiver.  *Missouri v. Seibert*, 542 U.S. 600, 608 n.1 (2004); *United States v. Burson*, 531 F.3d 1254, 1256 (10th Cir. 2008).

### B.   Waiver of *Miranda* Requirements

Before a valid waiver of a defendant's *Miranda* rights may be found, two requirements must be met: (1) the waiver must be a product of a free and deliberate choice rather than intimidation, coercion, or deception, and (2) it must be made in *full awareness* of the nature of the right being abandoned and the consequences of the decision to abandon it.  *Moran v. Burbine*, 475 U.S. 412, 421 (1986); *David*, 695 F.3d at 1068.

When a defendant waives a constitutional right, the defendant must first be made aware of the dangers and disadvantages so that the record will establish that he knows what he is doing and his choice is made with open eyes.  *Burson*, 531 F.3d at 1257.

A court must find that the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension before reaching the conclusion that *Miranda* rights were voluntarily, knowingly, and intelligently waived.  *Colorado v. Spring*, 479 U.S. 564, 573 (1987).

"When a *Miranda* violation is alleged to have occurred, the burden of proof rests with the government to prove the validity of the waiver by a preponderance of the evidence."  *United States v. Johnson*, 42 F.3d 1312, 1318 (10th Cir. 1994); *see Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  The burden of making a showing of a valid waiver is a heavy one.  *Miranda*, 384 U.S. at 475; *see Bond v. U.S.*, 397 F.2d 162, 165 (10th Cir. 1968).

### III.     ANALYSIS

Mr. Pearce was in custody when he was removed from his car and handcuffed. His custodial position continued at all times during his interactions with deputies: when he was placed in a police vehicle, when he was driven to the jail, when he was instructed to change into a jail uniform, and when his wrist was chained to a wall in a holding cell at the jail.

After handcuffing Mr. Pearce, but prior to *advising* him of his *Miranda* rights, Deputy Dodson interrogated Mr. Pearce.  Mr. Pearce made incriminating statements. Even statements Mr. Pearce may have intended to be exculpatory are likely to be used by the government as deceitful, inculpatory statements.

Even after Deputy Dodson informed Mr. Pearce of his *Miranda* rights, he failed to obtain a valid waiver from Mr. Pearce of those rights, launching *immediately* instead into the first of multiple interrogations of Mr. Pearce.  This provided Mr. Pearce no opportunity to waive his rights, no opportunity to invoke his rights, and no opportunity for even a moment's reflection.  Instead, the interrogation began and Mr. Pearce continued to make incriminating statements.

All of the statements Mr. Pearce made after he was handcuffed were obtained in violation of his *Miranda* rights and must be suppressed as the fruits of unlawful custodial interrogation.

WHEREFORE, Mr. Pearce respectfully moves this Court for an order suppressing all statements made by Mr. Pearce in response to an unlawful custodial interrogation.

Respectfully submitted,

9

Dated: July 29, 2022 s/Jolie Masterson
JOLIE MASTERSON
Masterson Hall, P.C.
1544 Race Street
Denver, CO 80206
Phone 720-663-9553
Fax 303-957-5579
Email: masterson@mastersonhall.com
Attorney for Mr. Pearce

10

**CERTIFICATE OF SERVICE**

  I hereby certify that on this 29th day of July 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

s/ Jolie Masterson_____
Jolie Masterson

11